UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | | |
|---|---|---|
| **DENNIS THOMAS** | * | **CIVIL ACTION NO.  12-0575** |
| **VERSUS** | * | **JUDGE DONALD WALTER** |
| **WARDEN, WINN CORRECTIONAL CENTER** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

*Pro se* Petitioner Dennis Thomas filed a petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on March 2, 2012 [doc. # 1] and a motion for Judgment on the Pleadings on December 7, 2012 [doc. # 18].  Respondent responded to the *habeas* petition on January 11, 2013.  [doc. # 27].  Petitioner, an inmate in the custody of Louisiana's Department of Public Safety and Corrections incarcerated at the Winn Correctional Center, Winnfield, Louisiana, attacks his Manslaughter conviction.  This matter has been referred to the undersigned for review, report, and recommendation in accordance with 28 U.S.C. § 636 and the standing orders of the Court.

## BACKGROUND

The underlying facts in this case have been set forth by the Louisiana Second Circuit Court of Appeal:

> Thomas and his victim, Chambers, had known each other in Shreveport's Lakeside neighborhood since November 2005. Thomas testified that he bought marijuana from Chambers a few times at a house on Andrew Avenue where "TT" Easter lived. On the evening of January 4, 2006, Chambers and his girlfriend, Teouna Fuller, who was pregnant with his baby, drove to TT's house. Chambers went inside while Fuller stayed in the car, her sister's 2004 Chevy Cavalier, sleeping. She was wakened by the sound of Thomas talking to her through the car window, asking where Chambers was; she replied that he was not in the car. On the front porch of the house, however,

Chambers saw Thomas talking to his girlfriend, and ran out to the car to confront him. Chambers, the smaller man, took a swing and landed a blow that busted Thomas's lip; a fight ensued in which Thomas gave Chambers a bloody nose and multiple bruises. No weapons were involved, and the men left the scene.

The next day, around 4:00 pm, Thomas was walking along Milam Street near Hearne Avenue when the Chevy Cavalier drove by, Chambers at the wheel and Ms. Fuller in the front passenger seat. Chambers turned around, drove up alongside Thomas and called him over. Thomas and Ms. Fuller essentially agree that at first, Chambers asked if everything between the two men was all right. According to Ms. Fuller, Thomas suddenly pulled a black handgun, pointed it through the passenger window and fired several shots into Chambers's body. At trial, however, Thomas maintained that the men argued: Chambers accused Thomas of disrespecting him by talking to his girlfriend behind his back and exclaimed that she was not a bitch. According to Thomas, when the words got heated, he saw Chambers grab for a gun and start to point it at him, at which time Thomas grabbed his own weapon and fired several shots in self-defense.

Mortally wounded, Chambers managed to drive the Chevy a few blocks to the intersection of Hearne at Dunlap, where he rear-ended another car. Ms. Fuller immediately called 911 on her cell; EMTs came within minutes, and the police arrived about the time Chambers's body was being placed in the ambulance. Chambers was declared dead shortly after arrival at LSU Health Sciences Center; the coroner's report stated that he died from multiple gunshot wounds. An autopsy identified six entry wounds to his shoulders and upper arms.

Officers searched the car at the scene, and again at the impound lot, but found no weapon or ammo in the car other than a .357 slug extracted from the inside of the driver's door. Ms. Fuller told officers that there was no gun in the car; she was studying to become a nurse, and being involved in a firearms offense would prejudice her chance of obtaining a license. At the scene of the shooting, officers also found no weapon, only two .22 shell casings and some broken glass.

Ms. Fuller described the suspect as a black male, six feet or taller, with a busted lip, wearing a white headband and headphones. Initially, she could not think of his name; moments later she told Detective Jeff Brown that he was Dennis Thomas. At the police station, she positively identified Thomas from a photo lineup. Det. Brown also testified that through anonymous 911 calls, police learned that Thomas was living with his grandparents on Ashton Street, some two blocks from the scene of the shooting.

With this information, around 8:00 pm several officers surrounded the house on Ashton Street and knocked on the door, asking for Thomas. The grandmother answered, and then Thomas himself came to the door. Officer A.L. Harvey testified that Thomas immediately put his hands up, but then turned around and ran into the

house. Officers entered and placed him under arrest. According to Officer Harvey, without any prompting Thomas said, "I know y'all think I shot that nigger," and stated that Chambers had hit him the night before. Officers gave him his Miranda rights.

At the police station, Thomas told Detective Shawn Parker, "I can't believe this. I don't know anything about this. I don't know why I'm being charged with this." Thomas again admitted that he and Chambers had been in a fight that morning, and that later that day Chambers drove up to him; however, Thomas maintained that he got scared and ran away. He claimed to know nothing about the shooting.

Back at the house on Ashton Street, officers searched Thomas's bedroom, finding a white bandana on the dresser and a Walkman elsewhere in the room. Under the house they found a Rossi .357 revolver. Corporal Danny Duddy testified that the gun yielded no usable fingerprints, but he swabbed it for any possible DNA evidence. Connie Brown, an analyst at the North Louisiana Crime Lab, analyzed the swab and a reference sample from Thomas. She testified that the swab contained DNA from at least two persons and Thomas could not be excluded as one of those persons. Based on statistics from the FBI lab, however, she testified that 99.7% of the population could be excluded as a DNA donor. Richard Beighley, a criminalist at the crime lab, analyzed the Rossi revolver found under the house on Ashton Street and the slug extracted from the door of the Chevy Cavalier. He concluded that the slug was fired from the Rossi, although he admitted there is no such thing as a "perfect match" between a gun and bullet.

After his indictment for second degree murder, Thomas elected a bench trial which took place over three days in September, October and November 2007. The state's witnesses testified as outlined above.

On the second day of trial, the district court excluded the grand jury testimony of a witness named Crystal Brown, which Thomas contended was exculpatory. The state argued, and the court agreed, that although Ms. Brown was unavailable to testify, her prior testimony was not subject to cross-examination and hence was inadmissible hearsay under La. C.E. art. 804 B(1). Thomas proffered the transcript under seal.

Thomas testified that early on the morning of the shooting, he had been talking to Ms. Fuller in front of TT's house on Andrew Avenue, that Chambers had confronted him about talking to his girlfriend, and that the two men had fought with the result that Thomas sustained a badly cut lip. He asserted that Chambers was "starting to make it rough around the neighborhood," and he heard that after this incident Chambers was looking for a gun. He admitted that when he first spoke to police detectives, he said he knew nothing about the shooting, but that in point of fact he pulled the gun and fired on Chambers only when he saw Chambers pulling a gun on him. He insisted that he acted purely in self-defense even though he never said this at the time. He also maintained that he had never seen or handled the Rossi revolver

3

> seized from under his grandmother's house; he dropped his own gun by a fence near that house. He also disputed that he tried to run away when Officer Harvey knocked on the door; he merely stepped back, lay on the floor, and let officers arrest him in front of his grandparents.
>
> In support of the claim of self-defense, Thomas called Dwight Davis, a convicted felon now serving in the Natchitoches Detention Center. Davis testified that he knew Chambers and was at TT's house on Andrew Avenue when Chambers and Thomas got into the fight. After being bested in the fight, Chambers got up off the ground and ran to the house, asking TT where the "scrap" (gun) was, and saying he was going to shoot Thomas. Davis thought Chambers was serious about wanting to hurt Thomas.
>
> Ms. Fuller testified that at the time of the shooting, Chambers was not threatening Thomas and was not carrying a gun. She reiterated that she would not handle a gun or even be around one because she wanted to become a nurse. She admitted that Chambers had been very agitated after the fistfight but that he had calmed down and never said anything about getting a gun to go shoot Thomas.

*State v. Thomas*, 7 So. 3d 838, 840-42 (La.App. 2 Cir. 2009).

The trial judge found Petitioner guilty of the lesser included offense of Manslaughter. (R. 593). On January 4, 2008, Petitioner was sentenced to thirty-three years imprisonment at hard labor (R. 642). On October 27, 2008, Petitioner filed an appeal to the Second Circuit Court of Appeal, in which assignments of error were briefed regarding (1) exclusion of trial testimony; (2) sufficiency of the evidence to convict; and, (3) excessive sentence. *See* (R. 656-73). His appeal was denied on April 8, 2009, and his application for rehearing was denied on May 7, 2009. (R. 711-29; 730-40; 778); *see also Thomas*, 7 So. 3d at 838. Shortly thereafter, Petitioner filed a writ application in the Louisiana Supreme Court, exclusively arguing that the trial and appellate courts erred by excluding the trial testimony of an exculpatory witness. (R. 741-77). A subsequent application was filed under the same docket number on May 11, 2009, raising the same issue. (R. 780). Petitioner's applications were denied on February 5, 2010. (R. 884); *see also State v. Thomas*, 27 So. 3d 296 (La. 2010).

On November 12, 2010, Petitioner filed an application for Post Conviction Relief

("PCR") in the First Judicial District Court raising five claims: (1) ineffective assistance of counsel; (2) insufficiency of the evidence; (3) trial court prevented him from offering relevant evidence in his defense of a criminal charge; (4) state failed to disclose exculpatory evidence; and (5) trial court admitted Petitioner's confession in violation of the Fifth Amendment.  (R. 972-1014).  On September 12, 2011, the state trial court denied Petitioner's PCR application.  (R. 1069-72).  His application for writs was denied by the Second Circuit on February 16, 2012.  (R. 1141).  The state appellate court found that Petitioner failed to provide a copy of his original application for PCR, containing his claims.  *Id.*  Petitioner filed a writ application to the Louisiana Supreme Court arguing that Second Circuit Court of Appeals erred in dismissing his writ application under U.R.C.A. Rule 4.5(H) for failure to include a copy of the Petitioner's original PCR application.  (R. 1146).  The Louisiana Supreme Court denied Petitioner's application on September 12, 2012.  (R. 1184).

Petitioner filed the instant petition on March 2, 2012, raising three claims.  *See* [doc. # 1]. Specifically, Petitioner argues that his conviction was obtained in violation of his constitutional right (1) under the Sixth Amendment to present evidence in his defense; (2) under the Sixth Amendment to effective assistance of counsel; and, (3) under the Fourteenth Amendment to be convicted only upon evidence proving guilt beyond a reasonable doubt.  *See* [doc. # 1-2].

The matter is now before the undersigned.

## LAW AND ANALYSIS

**I.      Standard of Review – 28 U.S.C. § 2254**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254, governs *habeas corpus* relief.  The AEDPA limits how a federal court may consider *habeas* claims. After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is limited to the record that was before the state court[.]" *Cullen v. Pinholster*, ––– U.S. –––, 131 S.

Ct. 1388, 1398 (2011). An inmate must show that the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). "The 'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Dowthitt*, 230 F.3d at 740. Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case." *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts. Federal courts presume such determinations to be correct; however, the petitioner can rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e).

**II.     Petitioner's Claims**

    A.     <u>Claim One: Right to present evidence in Petitioner's defense.</u>

Petitioner alleges that he was denied his Sixth Amendment right to present evidence in his own defense. [doc. # 1-2, P. 1]. Specifically, Petitioner contends that the trial court erred in excluding exculpatory grand jury testimony of an eyewitness, Crystal Brown. *Id*

The right to present a complete defense under the Sixth Amendment "is an essential attribute of the adversary system. However, this right is limited and must be weighed against the countervailing interests in the integrity of the adversary process . . . [,] the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process." *United States v. Mizell*, 88 F.3d 288, 294 (5th Cir. 1996). One such limitation is the Federal Rules of Evidence. *See Kittelson v. Dretke*, 426 F.3d 306, 318 (5th Cir. 2005). Fed. R. Evid. 804(b) states that certain evidence is not excluded by the rule against hearsay if the declarant is unavailable as a witness and it is testimony that "was given as witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and . . . is now offered against a party who had . . . an opportunity and similar motive to develop it by a direct, cross-, or redirect examination." Fed. R. Evid. 804(b)(1)-(2). The Supreme Court held that it is the burden of a criminal defendant to establish the "similar motive," stating that a defendant "has no right to . . . former testimony under Rule 804(b)(1) without showing a 'similar motive.'" *United States v. Salerno*, 505 U.S. 317, 322 (1992).

Louisiana has enacted its own Rule of Evidence Article 804 which adopts the same language as the above-quoted Federal rule. The state trial court considered Petitioner's arguments with regard to this issue and rejected them, stating that under Louisiana's parallel version of Fed R. Evid. 804, "the Court denies the defense'[s] request to admit the Grand Jury testimony into evidence ." *See* (R. 493-95). Additionally, on direct review, the state appellate court relied on the Supreme Court's holding in *Salerno* in affirming the trial court's decision concluding that

> [w]hen the defendant seeks to introduce secret grand jury testimony against the state, he or she must show a 'similar motive.' Plainly, in the grand jury the state would have called Ms. Brown on direct examination to establish the crime; at trial, the state would cross-examine her to discredit her recollection (for example, with respect to the number of shots fired). The record supports the finding of a dissimilar motive.

This assignment lacks merit.

*Thomas*, 7 So. 3d at 845.

Petitioner has failed to demonstrate how the trial and appellate courts' rulings constitute a decision that was contrary to, or involved an unreasonable application of the Supreme Court's holding in *Salerno*, *supra*. Moreover, "rules excluding evidence from criminal trials . . . do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." *United States v. Jimenez*, 593 F.3d 391, 402 (5th Cir. 2010); *see also United States v. John*, 597 F.3d 263, 277 (5th Cir. 2010) ("[T]he accused . . . must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."). Petitioner does not have an unfettered right to offer testimony that is inadmissible under standard rules of evidence, and the state court's finding that there was a 'dissimilar motive' is not an unreasonable application of federal law. Thus, Petitioner has failed to meet his burden of proof, and his claim should be **DENIED**.[1]

---

[1] Additionally, to the extent that Petitioner takes issue with the admissibility of Ms. Brown's testimony under state evidence rules, the undersigned notes that the Supreme Court has repeatedly held that "federal *habeas corpus* relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)); *see also Pulley v. Harris*, 465 U.S. 37, 41 (1984). Therefore, an alleged violation of state law, in and of itself, does not merit federal *habeas corpus* relief. As explained by the Fifth Circuit, federal courts "'do not sit as a "super" state supreme court' in [a *habeas corpus*] proceeding to review errors under state law." *Martin v. Wainwright*, 428 F.2d 356, 357 (5th Cir.1970)); *accord Cronnon v. Alabama*, 587 F.2d 246, 250 (5th Cir.1979). A federal court will only grant *habeas corpus* relief based on state court's erroneous evidentiary ruling if it results in a "denial of fundamental fairness" under the Fourteenth Amendment Due Process Clause. *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998) (quoting *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir.1983)). Petitioner has failed to establish that the state courts' decisions were so prejudicial and crucial in his conviction as to render his trial fundamentally unfair. In fact, as the Second Circuit noted, the excluded testimony was cumulative and not truly exculpatory.

B.     Claim Two: Effective assistance of counsel

Though not raised by the State, it appears, based upon the undersigned's review of the record, that Petitioner's ineffective assistance of counsel claim is procedurally barred.

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both 'independent' of the federal claim and 'adequate' to support that judgment. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir.1997); *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir.1995) (citing *Harris v. Reed*, 489 U.S. 255, 260, 262 (1989)). The independent and adequate state law doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or *habeas* review. *Amos*, 61 F.3d at 338. Procedural default does not bar federal review of a federal claim raised in a *habeas* petition unless the last state court to render a judgment in the case has indicated that its judgment is independent of federal law and rests on a state procedural bar. *Harris*, 489 U.S. at 263; *Glover*, 128 F.3d at 902.

As stated above, Petitioner raised his ineffective assistance of counsel claim on collateral review in the Louisiana courts. The record demonstrates that the last reasoned decision was that of the Louisiana Second Circuit which declined to consider Petitioner's writ application because he "fail[ed] to provide a copy of his original application for post-conviction relief containing his clams," and thus failed to comply with Rule 4-5(H) of the Uniform Rules of the Louisiana Courts of Appeal. This procedural denial was the last reasoned decision on the issue. *See Ylst*, 501 U.S. at 802.

A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural

9

bar. *Amos*, 61 F.3d at 338. To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases. *Walker v. Martin*, \_\_\_\_U.S.\_\_\_\_, 131 S.Ct. 1120, 1127, 179 L. Ed. 2d 62 (2011); *Glover*, 128 F.3d at 902.

This Court has previously held that Rule 4 of the Uniform Rules of the Courts of Appeal is an adequate procedural restriction. *See Batiste v. Cain*, 2009 U.S. Dist. LEXIS 100700, 2009 WL 3518169, *6 (W.D.La. Oct. 29, 2009) (because Louisiana courts of appeal regularly invoke them to bar review of non-conforming writ applications, Rule 4 of the Uniform Rules of the Courts of Appeal is "adequate" for purposes of applying the procedural default doctrine) (citing *Thomas v. Cain*, 2007 U.S. Dist. LEXIS 75804, 2007 WL 2874778, *9 (W.D.La. Sept. 7, 2007)); *Ware v. Cooper*, 2010 U.S. Dist. LEXIS 143062, 2010 WL 6637817, *7 (W.D.La. Nov. 19, 2010) (same), adopted, 2011 U.S. Dist. LEXIS 55143, 2011 WL 1837801 (W.D.La. May 12, 2011). Because the last reasoned judgment, that of the Louisiana Second Circuit, exclusively relied on Rule 4 in rejecting Petitioner's writ application, it is an independent basis for rejecting Petitioner's claim. Thus, the procedural default doctrine applies to Petitioner's ineffectiveness of counsel claim.

## CAUSE AND PREJUDICE

A federal *habeas* petitioner may be excused from the procedural default rule only if he can show "cause" for his default and "prejudice attributed thereto," or demonstrate that the federal court's failure to review the defaulted claims will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 731-32; *Amos*, 61 F.3d at 338-39 (citing *Harris*, 489 U.S. at 262; *Engle v. Isaac*, 456 U.S. 107, 129 (1982)).

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural

rules. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Petitioner has not offered any cause for the default which would excuse the procedural bars imposed by the Louisiana courts. This Court's review of the record does not support a finding that any factor external to the defense prevented Petitioner from raising this claim in a procedurally proper manner. Petitioner did not make any effort to re-file his writ application to the state appellate court after he was procedurally defaulted, and apparently made no effort to explain his inability to obtain a copy of the PCR application from the District Court. The record also does not reflect any action or inaction on the part of the State which prevented him from doing so.

"The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." *Hogue v. Johnson*, 131 F.3d 466, 497 (5th Cir.1997)(citing *Engle*, 456 U.S. at 134 n. 43). Having failed to show an objective cause for his default, the undersigned need not determine whether prejudice existed; however, it should be noted that Petitioner has not alleged any actual prejudice. *See Ratcliff v. Estelle*, 597 F.2d 474 (5th Cir.1979) (citing *Lumpkin v. Ricketts*, 551 F.2d 680, 681-82 (5th Cir.1977)).

Under these circumstances, Petitioner may avoid the procedural bar only if a fundamental miscarriage of justice will occur if the merits of his claims are not reviewed. *Hogue*, 131 F.3d at 497 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)). To establish a fundamental miscarriage of justice, Petitioner must provide this Court with evidence that would support a "colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986); accord *Murray*, 477 U.S. at 496; *Glover*, 128 F.3d at 902. When the petitioner has not adequately asserted his actual innocence, his procedural default cannot be excused under the "fundamental miscarriage of justice" exception. *Glover*, 128 F.3d at 903.

The record contains nothing that suggests Petitioner's actual innocence on the underlying convictions and, as stated *infra*, there was sufficient evidence at trial to establish his guilt beyond a reasonable doubt. Accordingly, no exceptions apply; his claim that counsel was ineffective is procedurally barred; and this claim should be **DENIED** on that basis.

  C. <u>Claim Three: Insufficient evidence to support Petitioner's convictions</u>

Petitioner argues that the evidence was insufficient to convict him of Manslaughter beyond a reasonable doubt.[2] [doc. # 1-2, P. 31-37]. In support of this claim, Petitioner maintains that he acted in self-defense against the victim, who was mad with jealousl, continued to bully and threaten him, and would have shot Petitioner had he not shot first.[3] *Id*.

When a *habeas* petitioner asserts that the evidence presented to the court was insufficient to support his conviction, the limited question before a federal *habeas* court is whether the state appellate court's decision to reject that claim was an objectively unreasonable application of the clearly established federal law set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Williams v. Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002). A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict

---

[2] Petitioner also claims that the trial court's denial of his motion for acquittal and the trial court's judgment of guilt violates his due process rights. Petitioner asserts these claims as separate from his insufficient evidence claim. *See* [doc. # 1-2, P. 37, 39]. However, in both of these claims, Petitioner merely re-urges the same arguments as in Claim 3. Accordingly, the undersigned will considered them as one.

[3] Respondent argues that Petitioner's insufficient evidence claim remains unexhausted because he failed to raise it in his application to the Louisiana Supreme Court. [doc. # 27, P. 26-27] (citing (R. 741-777)). Because Petitioner's claim lacks merit, the undersigned will address the merits without requiring full exhaustion. *See* 28 U.S.C. § 2254(b)(2).

or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). Thus, a conviction may rest on sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

The Louisiana appellate court properly invoked and applied the *Jackson* standard. *See Thomas*, 7 So.3d at 842-44. The court referenced the definitions relevant to the crime of Manslaughter under Louisiana law. *Id.* at 843. La. R.S. 14:31 defines Manslaughter as

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
>
> (2) A homicide committed, without any intent to cause death or great bodily harm.
>
> (a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person[.]

La. Rev. Stat. Ann. § 14:31 Additionally, the appellate court considered Petitioner's argument of self-defense, stating:

> Because Thomas admittedly killed Chambers, the only issue is whether he reasonably believed that he was in imminent danger of death or great bodily harm and that deadly force was necessary to save himself. Even if Chambers really pulled a gun, the fact that Thomas shot him six times before Chambers got off a single round seems to refute the theory of reasonable necessity. Moreover, the evidence overwhelmingly shows that Chambers was not armed. Thomas testified that Chambers reached across his torso with his right hand, as though to grab a gun, and did indeed point a gun at him. Ms. Fuller, however, testified not only that Chambers was not carrying a gun, but that she would not allow a gun in her car as it could adversely affect her nursing career. Police searched the Chevy twice, finding no gun or ammo. Even Thomas's own witness, Davis, admitted that prior to this incident he had never seen Chambers carrying a gun.
>
> In addition, Thomas's credibility was severely strained by his statements to police,

> which initially denied any knowledge of the killing but then morphed into a self-serving claim that Chambers pulled a gun on him. His persistent denial that he had ever touched the Rossi revolver, which was found under his grandmother's house, and mostly likely fired the slug recovered from the Chevy's door, was seriously questioned by DNA evidence that placed him in a scant 0.3% of the population that could have handled the gun.

*Thomas*, 7 So.3d at 843-44.

Ultimately, the Louisiana appeals court, applying the *Jackson* standard, found that the state trial court "could find beyond a reasonable doubt that Chambers did not pull a gun on Thomas and thus his deadly reaction could not be justified. *Id.* at 844. A review of the state court record shows that the state court's findings were entirely reasonable; *a fortiori*, the undersigned cannot say that the state court's application of *Jackson* was objectively unreasonable; therefore, Petitioner's claims for relief based on insufficiency of the evidence should be **DENIED.**

## CONCLUSION AND RECOMMENDATION

For the reasons stated above,

**IT IS RECOMMENDED** that the petition for *habeas corpus* filed by Petitioner Dennis Thomas [doc. # 1] be **DENIED and DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that Petitioner's motion for Judgment on the Pleadings [doc. # 18] be **DENIED** as moot.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have **fourteen (14) days** from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

**FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** *See* 28 U.S.C. § 2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 16th day of April, 2013.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE